960 F.2d 1227
 74 Ed. Law Rep. 26
 UNITED STATES of America, Plaintiff-Appellant,
and
Richard Ganaway, II, a minor, by his father and next friend,
Richard Ganaway; Renee Gasden, a minor, by her father and
next friend, Raymond Gasden; Tarsha Lucas, a minor, by her
mother and next friend, Catherine Williams; Stacy Brown, a
minor; Rotissa Renee Brown, a minor; Uganda Brown, a minor
by their mother and next friend, Louise Brown; Mitchelle
Buggs, a minor; Charlton Ancrum, a minor, by their father
and next friend, Henry Vernon; Bernard Simmons; a minor,
by his mother and next friend, Idell Simmons; David
Bonneau; Annette Bonneau, a minor; Sharon Bonneau, a
minor, by their mother and next friend Lorraine Bonneau;
Mona Lisa Lockhart, a minor; Dexter Smith, a minor; and
Lichelle Lockhart, a minor, by their mother and next friend,
Marthenia D. Lockhart; black school children attending
Charleston County public school represented by their
parents, Plaintiffs,
v.
CHARLESTON COUNTY SCHOOL DISTRICT; State of South Carolina;
Charlie G. Williams, Superintendent, State Board of
Education; Abraham Funchess; Joseph D. Parker; R.B.
Gentry; T.C. Kistler; John R. Stevenson; Lucy B. Hayes;
Creighton G. Edwards; Joyce Wimmer; Howard F. Burkey;
Jack F. McIntosh; Robert E. Livingston; Jessie B.
Schoolfield; W. Buford Estes; Louis O. Dore; Anne K.
Collins; Wilbur F. Smith, Jr.; Dolphus Carter, as members
of the State Board of Education; Richard W. Riley, Governor
and Chairman; Thomas G. Mangum; Marion Gressette; Earl
Morris; Grady Patterson, as members of the State Budget and
Control Board, Defendants-Appellees.
UNITED STATES of America, Plaintiff,
and
Richard Ganaway, II, a minor, by his father and next friend,
Richard Ganaway; Renee Gasden, a minor, by her father and
next friend, Raymond Gasden; Tarsha Lucas, a minor, by her
mother and next friend, Catherine Williams; Stacy Brown, a
minor; Rotissa Renee Brown, a minor; Uganda Brown, a minor
by their mother and next friend, Louise Brown; Mitchelle
Buggs, a minor; Charlton Ancrum, a minor, by their father
and next friend, Henry Vernon; Bernard Simmons; a minor,
by his mother and next friend, Idell Simmons; David
Bonneau; Annette Bonneau, a minor; Sharon Bonneau, a
minor, by their mother and next friend Lorraine Bonneau;
Mona Lisa Lockhart, a minor; Dexter Smith, a minor; and
Lichelle Lockhart, a minor, by their mother and next friend,
Marthenia D. Lockhart; black school children attending
Charleston County public school represented by their
parents, Plaintiffs-Appellants,
v.
CHARLESTON COUNTY SCHOOL DISTRICT; State of South Carolina;
Charlie G. Williams, Superintendent, State Board of
Education; Abraham Funchess; Joseph D. Parker; R.B.
Gentry; T.C. Kistler; John R. Stevenson; Lucy B. Hayes;
Creighton G. Edwards; Joyce Wimmer; Howard F. Burkey;
Jack F. McIntosh; Robert E. Livingston; Jessie B.
Schoolfield; W. Buford Estes; Louis O. Dore; Anne K.
Collins; Wilbur F. Smith, Jr.; Dolphus Carter, as members
of the State Board of Education; Richard W. Riley, Governor
and Chairman; Thomas G. Mangum; Marion Gressette; Earl
Morris; Grady Patterson, as members of the State Budget and
Control Board, Defendants-Appellees.
 Nos. 90-1812, 90-1816.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 5, 1991.
Decided March 12, 1992.
As Amended March 27, 1992.
 
 Irving Gornstein, U.S. Dept. of Justice, Washington, D.C., Thomas J. Henderson, Lawyers' Committee for Civ. Rights Under Law, Washington, D.C., argued (John R. Dunne, Asst. Atty. Gen., Dennis J. Dimsey, U.S. Dept. of Justice, Washington, D.C., Paul V. Holtzman, Lawyers' Committee for Civ. Rights Under Law, Washington, D.C., Arthur C. McFarland, Charleston, S.C., Julius Levonne, Chambers, NAACP Legal Defense & Educational Fund, New York City, on brief), for plaintiffs-appellants.
 Alfred A. Lindseth, Sutherland, Asbill & Brennan, Atlanta, Ga., argued (Robert N. Rosen, Alice F. Paylor, Rosen, Rosen & Hagood, Charleston, S.C., Charles W. Gambrell, Jr., Treva G. Ashworth, J. Emory Smith, Jr., Office of the Atty. Gen., Columbia, S.C., on brief), for defendants-appellees.
 Before SPROUSE, Circuit Judge, and HILL, Senior Circuit Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation, and WARD, Senior United States District Judge for the Middle District of North Carolina, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 Appellants brought this action in the district court seeking a judgment requiring county wide school desegregation remedies in Charleston County, South Carolina. After extensive hearings, the district court, in a published opinion, United States v. Charleston County Sch. Dist., 738 F.Supp. 1513 (D.S.C.1990), made findings of fact and conclusions of law and entered judgment dismissing the case. With one exception, we AFFIRM what the district court has done. However, concluding that the district court failed to make findings with respect to one issue which should be resolved, we VACATE the judgment dismissing the case and REMAND for further proceedings.
 
 INTRODUCTION
 
 2
 Charleston County stretches roughly 100 miles along the Atlantic coast, comprising approximately 938 square miles. Prior to 1951, twenty-one independent school districts operated within the county. The schools within these districts operated under a dual system, with black and white students each attending racially segregated schools. In 1951, four years before the United States Supreme Court decisions in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), and Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ), ordered school boards operating dual school systems to "effectuate a transition to a racially non-discriminatory school system," Brown II, 349 U.S. at 301, 75 S.Ct. at 756, the South Carolina General Assembly consolidated the twenty-one districts into eight districts. These eight districts varied greatly in size and population. Their boundary lines all followed natural geographic patterns unique to Charleston County and all but two of the districts were separated from each other by bodies of water. The schools within these eight districts continued to operate on a dual system until well into the 1960s.
 
 
 3
 Until 1967, the eight districts existed as totally separate entities, with each district responsible for its own fiscal and administrative operations. In 1967, the South Carolina General Assembly enacted Act 340, 1967 S.C. Acts 340. Act 340 created the Charleston County School District (CCSD), which encompassed all of Charleston County. Most fiscal and administrative powers and responsibilities previously held by the eight school districts were absorbed by the CCSD. Most notably, the CCSD was empowered to distribute county tax revenues evenly among the eight districts in an effort to alleviate the unequal tax bases then existing among the districts.[1] The eight districts continued their existence and were labeled "constituent districts." Under Act 340, the constituent districts retained their independent boards of trustees and independent administrative authority over teacher and pupil assignments and student discipline.[2] For more than twenty years, the CCSD and the eight constituent districts have operated under this system.
 
 
 4
 On January 9, 1981, the United States filed this action, alleging, basically, that the 1967 Act of the South Carolina General Assembly, under which the schools in Charleston County operate today, violates the Equal Protection Clause of the Fourteenth Amendment. The complaint specifically alleged: (1) that the public schools in Charleston County are "substantially segregated by race"; (2) that the racial segregation is the result of "intentionally discriminatory legislation and administrative actions" by the CCSD and State; and (3) that the part of the 1967 Act which enables the constituent districts to retain power over student and teacher assignment "were enacted with the purpose and have had the effect of discriminating against students in Charleston County schools on account of their race and segregating such schools by race."
 
 
 5
 More than seven years later, in September of 1988, the CCSD completed presenting its defense in the district court. In its findings and conclusions, the district court concluded that, (1) Act 340 as enacted by the South Carolina General assembly is constitutional; (2) the CCSD had fulfilled its affirmative duty under Brown I to dismantle dual school systems; and (3) the CCSD had properly interpreted Act 340 in carrying out its duty to desegregate. The district court also found that the schools within each constituent district are racially balanced.
 
 
 6
 It is from this ruling that appellants bring this appeal. Appellants claim error in the district court's conclusions that, (1) the eight constituent districts are valid and that the CCSD is not a single district; (2) that Act 340 as enacted is constitutional and prevents the CCSD from being required to implement system wide desegregation; and (3) that the CCSD has satisfied its affirmative constitutional obligation to eliminate dual schooling. No error is claimed in the district court's finding that the schools within each constituent district are racially balanced.
 
 
 7
 On review, we are bound to the district court's factual findings unless they are clearly erroneous. See Fed.R.Civ.Pro. 52(a); Vaughns v. Board of Educ., 758 F.2d 983 (4th Cir.1985). Because the district court literally lived with this school desegregation case for a number of years, its factual determinations are accorded a high level of acceptance. See Columbus Bd. of Educ. v. Penick, 443 U.S. 449, 457 n. 6, 99 S.Ct. 2941, 2947 n. 6, 61 L.Ed.2d 666 (1979); Riddick v. School Bd., 784 F.2d 521 (4th Cir.), cert. denied, 479 U.S. 938, 107 S.Ct. 420, 93 L.Ed.2d 370 (1986) (Factual findings by the district court in school desegregation case, especially where the presiding judge has lived with the case for many years, are entitled to great deference on review).
 
 
 8
 Based primarily on the considered opinion of the district court, with the observations detailed below, we AFFIRM in part and VACATE and REMAND in part.
 
 I. The Eight Constituent Districts
 
 9
 The obligation of a school district that is operating one-race schools is to "take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Green v. County Sch. Bd., 391 U.S. 430, 437-38, 88 S.Ct. 1689, 1693-94, 20 L.Ed.2d 716 (1968); see Charleston County, 738 F.Supp. at 1518-19. Appellants admit that, although one-race schools exist in some of the constituent districts, each of the constituent district boards of trustees has done everything within its power to desegregate the schools within each district and that each of the eight constituent districts is operating unitary schools.
 
 
 10
 A separate and autonomous school district may not be required to help remedy existing segregation occurring in another district. Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974). Appellants claim that Milliken is inapplicable to the present action because in 1967, the eight constituent districts lost their independent identity and were consolidated into a single district--the CCSD. In turn, the appellants argue, the CCSD assumed the affirmative obligation to employ all feasible measures within its power to desegregate all schools within the CCSD. As stated by the government in its brief, the essence of appellant's argument is quite simple: If there is a single school district in Charleston, then further desegregation is required; if there are eight separate school districts in Charleston, then no further desegregation is required.
 
 
 11
 Appellants' contention that there are current racial disparities within the CCSD is premised upon evaluating the racial composition of individual schools' student populations in relation to the total student enrollment in the CCSD. When so evaluated, appellants argue, the CCSD contains a disproportionate number of black and white schools. The district court ruled, however, that the racial makeup of student enrollment and teacher assignment should not be evaluated from the perspective of the CCSD as a whole, but from the racial makeup of the constituent district in which the school is located:
 
 
 12
 In the instant case, Charleston County was divided into eight school districts during the time that the dual system was maintained, and there is nothing unconstitutional about treating it as eight school districts for the purpose of dismantling that system. No attempt has been made to divide it into smaller districts which would have been more segregated if the prior system had been preserved. Charleston County properly maintained the same districts for the purpose of school attendance and faculty assignments [as existed when the duty to desegregate was undertaken].
 
 
 13
 Charleston County, 738 F.Supp. at 1527.
 
 
 14
 We find nothing improper in this evaluation. Until at least 1963, schools in Charleston County operated under a dual system within each of the eight districts. When the duty to desegregate the schools within the county was assumed, that duty was upon the several districts. Passage of Act 340 in 1967 simply continued in place the same school districts with precisely the same powers and territorial authority over student and teacher assignment as had existed since 1951. The duty to desegregate continued in each of those districts as well.
 
 
 15
 This analysis has support in Supreme Court precedent. Prior to Milliken v. Bradley, the Supreme Court cases on the subject had only addressed school desegregation violations and remedies within the context of a single school district. Id. at 745, 94 S.Ct. at 3127. In Milliken, however, the Court for the first time considered the appropriateness of an interdistrict court ordered desegregation plan as a remedy for an intradistrict segregation violation. In striking down the interdistrict plan, the Court said that:
 
 
 16
 [T]he scope of the remedy is determined by the nature and extent of the constitutional violation. (citation omitted). Before the boundaries of separate and autonomous school districts may be set aside by ... imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts ... of a single school district have been a substantial cause of interdistrict segregation.
 
 
 17
 Id. 94 S.Ct. at 3127. In the present case, appellants concede (1) that there are no existing intradistrict constitutional violations; (2) that each constituent district is operating unitary schools; and (3) that all eight constituent districts are as desegregated as possible. Thus, it appears that no need for an interdistrict remedy exists.
 
 
 18
 But school district lines are not sacrosanct. "An interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts cause racial segregation in another district, or where district lines have been deliberately drawn on the basis of race." Id. Appellants argued in the district court that the 1951 establishment of the district lines was racially motivated. The district court found, however, "no reasonable evidence to support this contention." Charleston County, 738 F.Supp. at 1535. This factual determination by the district court is not clearly erroneous. Given the status of state law in 1951, then presumed to be constitutional, it is quite possible that certain legislators were motivated in many of their actions by a desire to separate the races. However, the fact that the district lines follow clear geographic and riparian boundaries unique to Charleston County indicates that there were other controlling factors motivating the General Assembly. The fact that South Carolina does not keep records of its legislative history makes it impossible to determine what exactly motivated the 1951 action. See Charleston County, 738 F.Supp. at 1526. In any event, reliance upon legislators' statements and candidate speeches in divining the intent of a legislative body is a step to be taken cautiously and the statements of individual legislators should not be given controlling effect. See Piper v. Chris-Craft Ind., Inc., 430 U.S. 1, 26, 97 S.Ct. 926, 941, 51 L.Ed.2d 124 (1977); Brock v. Pierce County, 476 U.S. 253, 263, 106 S.Ct. 1834, 1840-41, 90 L.Ed.2d 248 (1986); Chrysler Corp. v. Brown, 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979).
 
 
 19
 Thus, appellants' claim is simply that there is only one school district in Charleston County--the CCSD--and that the eight constituent districts are merely shams. On this issue, the district court treated the constituent districts as separate political entities and the powers vested in them as important, separate and apart from the responsibilities of the CCSD. See Charleston County, 738 F.Supp. at 1525. This finding is not clearly erroneous. The local determination of school attendance zones and student discipline is a tradition as rich as the neighborhood school itself. "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to [the] quality of the educational process." Milliken, 418 U.S. at 741-42, 94 S.Ct. at 3125-26; see Wright v. Council of Emporia, 407 U.S. 451, 469, 92 S.Ct. 2196, 2206, 33 L.Ed.2d 51 (1972); San Antonio Independent Sch. Dist. v. Rodriguez, 411 U.S. 1, 50, 93 S.Ct. 1278, 1305, 36 L.Ed.2d 16 (1973).
 
 
 20
 The inquiry of whether the schools of Charleston County are in compliance with their affirmative duty to eliminate all vestiges of dual schooling is focused on each constituent district. Each constituent district has the authority to assign pupils to a particular school. Appellants argue that creation of the CCSD to oversee certain administrative functions and tax revenue distribution resulted in the consolidation of the entire county into one single district. Were this the case, each state would be classified as one district. State governments fulfill crucial administrative roles over their schools. In the present case, the State defines what may comprise a school district, see S.C.CODE ANN. § 50-1-160 (1990); sets standards for local school boards and boards of trustees, see id. §§ 59-1-340, 59-1-350; and governs the disbursement of state funds to the districts, see id. § 59-20-40. If existing districts remain undisturbed, the creation of additional powers in state government or in administrative units such as the CCSD does not merge the existing districts into a new large district. There is no precedent for such a drastic holding: the Supreme Court has specifically rejected this argument when made in favor of an interdistrict desegregation order. See Milliken, 418 U.S. at 749, 94 S.Ct. at 3129 (Accepting arguendo the derivative responsibility of the State for the actions of a political subdivision of the State causing segregation does not lead to the conclusion that an interdistrict remedy is appropriate).
 
 
 21
 Appellants' criticism is not with what Act 340 did change, but with what it did not change. By leaving the power to assign and transfer students with the constituent districts, the General Assembly, in essence, took no action; it merely maintained the status quo. By undertaking to eradicate unequal tax bases in Charleston County, see note 1, supra, the General Assembly did not assume a duty to consolidate authority over teacher and pupil assignment and transfer. By taking no action to dismantle the eight districts for purposes of student and teacher assignments, it does not follow that the General Assembly acted with discriminatory intent.
 
 
 22
 Under appellants' argument, no action to equalize the distribution of tax revenues could be undertaken unless, at the same time, district lines for purposes of school assignment were changed. A statute is not constitutionally invalid because it might have gone further than it did. See Goesaert v. Cleary, 335 U.S. 464, 467, 69 S.Ct. 198, 199, 93 L.Ed. 163 (1948). Of course the State could have consolidated Charleston County schools for purposes of assignment had it so desired, but it was under no obligation to do so. It is clear that the rescission of school board action which a school board is under no duty to promulgate in the first place is not a constitutional violation. See Dayton Bd. of Educ. v. Brinkman, 433 U.S. 406, 414, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977). Likewise, the fact that the General Assembly did not consolidate the eight school districts for purposes of assignment, which it was under no constitutional obligation to do, is not an Equal Protection violation. Appellants' argument would force the State into the Hobson's choice between taking no action at all or acting to remedy problems within its sphere of influence. The Equal Protection clause requires no such choice.
 
 
 23
 The district court rulings that the eight constituent districts are separate and distinct and that Act 340 was not enacted with discriminatory intent are AFFIRMED. Because all parties concede that each of the eight constituent districts is currently operating unitary schools, no further duty to desegregate exists.
 
 II. Interdistrict Transfers
 
 24
 Act 340 is silent regarding the interdistrict transfer of students. Under the general laws of South Carolina, however, a student in one district may transfer to another district if the student may be better accommodated in that district and provided that the trustees of both the transferring and receiving constituent districts approve of the transfer. See S.C.CODE ANN. §§ 59-63-490 to 59-63-510. A refusal by a constituent district to permit an interdistrict transfer may be appealed to the CCSD and on appeal the CCSD decides only whether the refusal was unreasonable or arbitrary. Id. § 59-63-510. The CCSD has no authority under the laws of South Carolina initially to order an interdistrict transfer.
 
 
 25
 Under both the law of South Carolina and the local rules of Charleston County, there appear to be reasons that are considered to be adequate and treated as valid for granting an interdistrict transfer.[3] Interdistrict transfers for attendance at magnet schools have been both approved and denied by the constituent districts out of which students have sought to transfer. See Jt.App., Vol. I, pp. 177-79. The constituent districts have refused to allow interdistrict transfer requests for purposes of desegregation. The CCSD, on appeal, has upheld the right of the constituent districts to deny these desegregative interdistrict transfers. The government alleges that the CCSD has indicated that desegregative transfers would not be allowed even when both the sending and receiving districts approved them.
 
 
 26
 The fact that the court does not order an interdistrict remedy to further integration in the entire county does not imply that an integrated education is not a desirable goal. The court does not commend refusal of such transfers; it simply does not order them. The policy of denying interdistrict transfer requests for the purpose of integration, where the district out of which the student seeks to transfer is unitary, is not unconstitutional whether or not it is commendable.
 
 
 27
 We are concerned that this may be misunderstood by school officials. If they are not required to approve transfers for purposes of integration, does it follow that an integration motive militates against transfer approval? It does not. A desire to further integration is not a mark against a transfer request. If the trustees involved do not find an integration reason for transfer to be a sufficient reason, then that reason must be eliminated from consideration. The request must be evaluated entirely on whatever, if any, other reasons are given in support.
 
 
 28
 In the area of interdistrict transfers, considerations of race are accorded no weight and rendered nullities. Even though race is an insufficient reason for requiring the grant of an interdistrict transfer request, race may not be used as a basis for denying an interdistrict transfer. It is this distinction that gives us reason for concern in the present appeal.
 
 
 29
 Although the record is not wholly clear, and the district court was unable to make precise findings, there is at least some evidence of the following situation's having occurred in Charleston County: In 1977, the CCSD, under its authority, converted the all black Memminger Elementary School located in constituent district 20 into a model magnet school with a specially designed curriculum.[4] Parents both inside and outside of district 20 supported the model school for both its curriculum and its potential for a racially diverse student body. Some constituent districts out of which students sought to transfer in order to attend Memminger approved the transfer requests. However, district 10, a predominately white district, denied the transfer requests. The students who were denied transfers from district 10 appealed the denial to the CCSD. On appeal, the CCSD upheld the right of the constituent district to refuse the transfer request. There is indication in the record that these denials were grounded on the premise that desegregative interdistrict transfers were not allowed. By the time of trial, Memminger had once again become virtually an all black school.[5]
 
 
 30
 We have already stated that in deciding whether to grant an interdistrict transfer request from a unitary school district, considerations of race are accorded no weight. Accordingly, under the facts of this case, transfers sought for the sole purpose of furthering integration may be denied. However, this principle also has application where an interdistrict transfer is sought for a valid reason. Where a transfer is sought for a valid reasonwhether or not in addition to a desire to further integration--that part of the reason for seeking the transfer based on the desire to further integration is accorded no weight, leaving only consideration of the valid reason. In a situation where a transfer for purposes of attending a magnet school is valid, but squelched by a constituent district because the desire of the student is, or the result of the transfer will be, an integrated student body, there has been a denial of Equal Protection. This follows from the fact that others with valid reasons to transfer are granted permission to transfer and our holding that, in determining whether to grant the transfer, that part of the equation that is represented by racial integration, pro or con, is a nullity.
 
 
 31
 Although a desire to achieve further integration by transfer is not sufficient to require the separate constituent districts to grant the transfer, such a desire may not be the reason for a denial. We conclude that, in this case, a racially based reason for a transfer is a nullity, not required to be granted and not allowed as a basis for a denial. If no valid reason for a transfer exists, a request based on desire to integrate may be denied. If there is a valid reason--a reason upon which transfer requests are granted--such a transfer request may not be denied because it is also sought for--or would result in--further integration.
 
 
 32
 While the definition of those reasons which are sufficient to grant an interdistrict transfer request is murky, it is clear from the existing record that, over the years, constituent districts and the CCSD have granted transfers sought for what they have considered sufficient--or valid--reasons. However, these reasons are not clearly discernable from the record. Some of these reasons are evident, see note 3, supra, and it does appear that at least some of the constituent districts found a desire to attend the Memminger model school to be sufficient reason to grant a transfer. It does not appear that district 20 found that reason to be insufficient. The record indicates that the transfer requests of the district 20 students were also accompanied by a stated interest in the integrated student body that was anticipated at Memminger. While it is not required that the district grant the transfer request just for integration purposes, a transfer request based on a valid reason in addition to integration purposes does not justify refusal. The resultant situation--where a student who wants to transfer solely for the reason of attending a model or magnet school is allowed to transfer; whereas a student wanting to go to a model school and obtain the benefits of an integrated education is not allowed to transfer--constitutes an Equal Protection violation. See Singleton v. Jackson Mun. Separate Sch. Dist., 419 F.2d 1211, 1218-19 (5th Cir.1969), rev'd on other grounds, 396 U.S. 290, 90 S.Ct. 608, 24 L.Ed.2d 530 (1970) ("If the school district grants transfers to students living in the district for their attendance at public schools outside the district, or if it permits transfers into the district of students who live outside the district, it shall do so on a non-discriminatory basis [ ].")
 
 
 33
 During testimony, the district judge stated that, even though he had heard a great deal of evidence on the matter, he didn't fully understand "what happened at Memminger." See note 5, supra. No factual findings regarding the Memminger situation were set forth in the district court's opinion. Accordingly, we remand for further findings on this matter. If the district court finds that interdistrict transfers for purposes of attending a model or magnet school are valid and if the district 10 students' requests to transfer into district 20 in order to attend the Memminger model school were denied because the requested transfer was premised upon a desire for racial integration in addition to a valid reason, then denial of the transfer by the constituent district shall be enjoined. An interdistrict transfer request based at least in part upon a valid reason that is denied by the constituent district because the effect of the transfer would be to further integration shall also be enjoined.
 
 
 34
 We also think it would be wise for the district court to clarify precisely what constitutes, and has constituted, a valid reason for an interdistrict transfer between the eight districts in Charleston County. This clarification, along with our instruction that racial considerations are accorded no weight--either pro or con--in a transfer request, will help alleviate future controversies.
 
 
 35
 We emphasize that our holding here is narrow. Where the sole motive behind a request to transfer between constituent districts is racial integration, that request may properly be denied as there is no foundation to grant it. Where a transfer request is premised upon a valid reason and, also, a desire to integrate racially, that part of the request premised upon racial integration is accorded no weight and consideration shall be accorded only to the valid reason. While a desire to integrate is not a sufficient reason to require a transfer approval, it may not be a reason to deny an otherwise valid transfer request. We leave to the district court to clarify what is a valid reason for an interdistrict transfer, and request precision in that definition.
 
 JUDGMENT
 
 36
 As set out in Part I, we find no reversible error in the findings made by the district judge. However, in order that additional findings and conclusions may be completed as outlined in Part II, we VACATE the district court's dismissal and REMAND for further proceedings. We leave to the determination of the district judge the method to be employed in determining these facts. Whether further hearings are required or factual findings can be made from the record already assembled will be determined by the district judge on remand.
 
 
 37
 AFFIRMED IN PART AND VACATED AND REMANDED IN PART.
 
 SPROUSE, Circuit Judge, dissenting:
 
 38
 I respectfully dissent.
 
 
 39
 * At least since 1895, the constitution and statutes of South Carolina required that public schools be segregated by race. Prior to 1951, there were two school systems in Charleston County, one for the City of Charleston and one for the county. Each system was governed by its own Board of Education. The twenty-one so-called "school districts" in the county system, were, in reality, merely informal attendance zones. While most of the districts contained elementary schools, the few high schools in the county served students from more than one "district." Two "colored" high schools served the black students who were bused to them from all over the county.
 
 
 40
 In 1951, the Charleston County Board of Education consolidated the twenty-one attendance zones of Charleston County into eight districts. At the time the boundaries were drawn, the Board was required to follow criteria established by the State Education Finance Commission explicitly requiring race-conscious line drawing. These eight districts continued to operate under a dual, segregated system for the next decade while the county scrambled to construct elementary and high schools in each district. Although the district court made no specific finding of fact in this regard, it is apparent from the record that the Charleston County schools, along with all other South Carolina public schools, continued de jure segregation from 1951 through at least 1967, despite the decisions of the Supreme Court in Brown v. Board of Education I, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), and Brown v. Board of Education II, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ).
 
 
 41
 The State of South Carolina had been a party in Brown II, and in the years after Brown I and Brown II there was considerable interaction between the Department of Justice and the Charleston County School system with regard to the school district for the City of Charleston. However, in contrast to other systems which maintained segregated schools, there was no federal court action to desegregate the schools on a county-wide basis until this action was brought in 1981.[1]
 
 
 42
 In 1967, the South Carolina Legislature passed Act 340. That Act consolidated the eight districts created in 1951 into the Charleston County School District (CCSD)[2] and vested extensive powers in the County School Superintendent[3] and the Board.[4] Although the Act consolidated the school districts in Charleston County, it retained the eight former school districts created in 1951 for certain purposes, denominating them "special" or "constituent districts."[5] The Act also contained specific procedures for hiring teachers[6] and for teacher transfers.[7]
 
 
 43
 When the plaintiffs filed this action in 1981, the public schools in Charleston County had operated under the system created by Act 340 for fourteen years. During this period of time, the Charleston County School Board exerted sole control over many vital aspects of the operation of all county schools and supervised the administrative duties given the constituent districts by Act 340. However, while the school board controlled student transfers, changed boundary lines to relieve overcrowding, assigned special education students, enacted uniform disciplinary codes, and set standards for and recruited faculty, the Board consistently declined even to suggest plans that would establish racially-balanced faculties or student bodies within or across constituent districts.
 
 
 44
 By 1981, when this suit was filed, the ratio of black students to white students in Charleston County was virtually one-to-one. The total student body was composed of 54% black pupils and 46% white pupils. Yet, of a total of sixty-seven public schools in the county, twenty-four, more than one third, had virtually all-black student bodies (90% or greater black). Forty-five percent of the black children in the county attended these schools. Twenty-three of the sixty-seven schools (another third) in the county were predominantly (66% or greater) white.
 
 
 45
 Thus, in a county with almost equal numbers of black and white students, more than two thirds of the schools were of predominately one race. By the time the judgment below was entered some nine years later, eighteen schools were still over 90% black. Thirty-six percent of the black students in the county were enrolled in virtually all black schools. In sum, although the numbers of black and white students in Charleston County are almost equal, approximately 50% of the county's children today attend schools which are, for practical purposes, one race schools. Thirty-eight years after Brown, half of the school children in Charleston County attend schools that are not integrated.
 
 II
 
 46
 The plaintiffs contend that the eight constituent districts were designed to perpetuate segregation, and that these districts are vestiges of a former de jure segregated school system. They contend further that the South Carolina Legislature enacted Act 340 with the intention of ensuring continued racial segregation in Charleston County schools, and that both the Board and constituent district school boards have interpreted and administered Act 340 to prohibit constitutionally required integration.
 
 
 47
 The defendants, on the other hand, respond that the predominant motive of the state legislature in passing Act 340 had nothing to do with race, and that therefore the Act does not violate the Fourteenth Amendment of the United States Constitution. They argue that, as a result, school administrators are bound by Act 340 and have, pursuant to its provisions, been administering schools on a nondiscriminatory basis in Charleston County.
 
 
 48
 The district court focused on the constitutionality of Act 340, identifying the issues in the case as follows:
 
 
 49
 The primary legal issue before the court is whether the CCSD and the Constituent Districts have fulfilled their affirmative duty to eliminate the former dual school system in Charleston County. In deciding this issue, the court must consider at the outset the validity, interpretation and effect of Act 340, the principal statute governing public education in Charleston County. Specifically, the court must decide:
 
 
 50
 1. Whether Act 340 was enacted with a discriminatory purpose;
 
 
 51
 2. Whether Act 340 has had a discriminatory effect; and
 
 
 52
 3. Whether the CCSD and the Constituent Districts have properly interpreted Act 340 in carrying out their respective affirmative duties to eliminate all vestiges of the former dual school system in Charleston County.
 
 
 53
 The district court reviewed the evidence concerning the individual motives of South Carolina legislators in passing Act 340. While recognizing that the evidence was conflicting, it held that race was not the dominant legislative motive in creating the Charleston County School District and in designating the eight existing school districts as constituent districts. The court held that, rather than being motivated by race, the state legislative bodies were principally motivated by a desire to achieve fairness in the allocation of school funds, i.e., that tax revenue from economically advantaged areas of the county would not be wholly retained in the constituent districts where the tax revenue was received, but would be distributed county-wide according to the fiscal needs of each school. Reasoning that since the state legislation was not based on racial considerations and was therefore not violative of the United States Constitution, the district court concluded that the Board was prohibited by Act 340 from integrating the schools between constituent districts. The court stressed that Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974), also prohibited the courts from integrating across the constituent district lines to achieve a county-wide school population that is racially balanced.
 
 
 54
 In resolving the issues in favor of the defendants, the district court found that the plaintiffs had not demonstrated the existence of meaningful disparities in the racial composition of the Charleston County schools (within each constituent district) as defined by controlling precedent. The court recognized disparities across district lines, but it found that any disparities across constituent districts were the result of demographics, natural geographic factors, and so-called "white flight"--the choice of white families to move away from black school areas or to send their children to private schools.
 
 
 55
 The district court also found that the eight constituent districts were not the vestiges of previous de jure segregation. In its thirty-one page opinion, the court devoted a single footnote to the issue of how the boundaries of the eight constituent districts were drawn:
 
 
 56
 In 1951, Charleston County was comprised of twenty-one (21) separate school districts. In the fall of 1951, the Charleston County Board of Education consolidated the 21 districts into the 8 districts that today exist as "Constituent Districts." Plaintiffs contend that the consolidation in 1951 was effected to keep Charleston schools as segregated as possible in anticipation that dual school systems would some day be found unconstitutional. The court finds no reasonable evidence to support plaintiffs' contention. This finding is bolstered by the fact that both plaintiffs concede that each constituent district itself is a[s] desegregated as it can be, given Charleston's geography and large number of private schools, as further elaborated, infra.
 
 
 57
 United States v. Charleston County School Dist., 738 F.Supp. 1513, 1519 n. 4 (D.S.C.1990).
 
 
 58
 Finally, the district court held that all of the schools in Charleston County have achieved unitary racial status.
 
 III
 
 59
 My dissent from the opinion of my brothers in the panel majority is grounded in my disagreement with some aspects of the district court's findings and with both the basis and results of its legal reasoning. As I understand it, the view of both the district court and my panel colleagues is that the controlling issue in this case is whether we review the actions of each of eight constituent district boards of education or the acts of one single board of education. My initial point of departure from the reasoning of my brethren is their conclusion that we review only the actions of eight individual boards.
 
 
 60
 I appreciate that the Fourteenth Amendment does not normally require integration across school districts. See Milliken v. Bradley, supra. In my view, however, the principles of Milliken are not implicated in this appeal because I am persuaded that the 1967 South Carolina Legislature created a single county-wide school system controlled by a central school board and superintendent, leaving the eight separate subdistricts with minimal administrative duties. The CCSD Board of Trustees was given sole power to adopt budgets, raise taxes, and disburse funds; to purchase and sell land; to build, maintain, and demolish schools; and to purchase services, equipment, and supplies. It was given authority to determine curricula and set county-wide policy for the instructional program. Thus, contrary to the view of the district court, the CCSD obviously did more than merely channel funds to constituent districts.
 
 
 61
 Although it is true that the constituent districts were given the administrative duty of employing teachers, teachers are hired only after CCSD personnel recruit applicants and send them to the districts for interviews. Moreover, while the constituent district boards assign, transfer, and discipline students, their decisions are "subject to appeal to the [CCSD] Board of Trustees." Act 340, § 7. It is significant, I think, that the CCSD employs a large central staff whereas the staff of the constituent district boards normally consists of one superintendent and one secretary.
 
 
 62
 These facts lead me to conclude that we deal here with one school district. Regardless of the motives of individual legislators in voting for Act 340, in my view, the Act effectively established a countywide school system for Charleston County. Its structure and allocation of power support this conclusion. The authority to raise and allocate school funds, designate the construction of school buildings and other facilities, and its other powers demonstrate that the CCSD Board of Trustees has the overriding authority to operate all of the schools in the county. The record shows that, except when operations related to desegregation, the CCSD effectively assumed responsibility. In light of the overriding authority vested in the CCSD, the functions retained by the constituent districts are for constitutional purposes simply not sufficient to make them separate school systems.
 
 
 63
 As the district court's decision was premised on its conclusion that it was reviewing the actions of eight school districts rather than one, I would remand to require consideration of the issues as they relate to a single county board.
 
 IV
 
 64
 In addition to the single district/multiple district dispute thought by my colleagues to present the pivotal issue, critical to this desegregation controversy is whether the current school system is based on the vestiges of a system that was previously dual. Act 340, of course, utilized the boundaries of the eight districts established in 1951. Resolution of the crucial issue should have centered on the circumstances of the drawing of these boundaries in 1951. Admittedly, if the district court had properly construed the school system as encompassing the entire county, the question of discriminatory intent in originally drawing the lines of the eight constituent districts might be less important. Even then, however, the effect of those 1951 actions might have some probative value on the issue of discrimination vel non on the part of Charleston County school board officials during the period after the creation of the CCSD in 1967.
 
 
 65
 Thus, in addition to determining whether Charleston County had one functional school district or eight, the district court should have focused its attention on the existence of discrimination underlying the original creation of the eight constituent districts. In that, it failed, and the evidentiary basis for its finding on this issue was certainly not sufficiently detailed so that we should defer to its findings. Our reliance and deference to such findings cannot be grounded on merely conclusory statements.
 
 
 66
 Almost forty years after Brown, Fourteenth Amendment attacks on public school systems certainly come to judicial fora in different postures. Nevertheless, in determining whether present school boundaries are the vestiges of a previously entrenched dual system, an in-depth exploration of racial motivation is critical. This is another reason why I think this case should be remanded by the district court to make indepth findings on the factual issue of whether the eight "constituent districts" are vestiges of the previously racially-segregated dual system. It is possible, of course, that the boundaries could have been drawn for reasons innocent of racial intent or effect. It may well be that different configurations would have required extensive busing or other burdening administrative duties.[8] Suspect, I think, is the district court's finding of how, in 1951, South Carolina educators and legislators, while required by their state constitution to segregate their schools by race, could not have considered race when devising the districts. In any event, a review of all these factors should be a prerequisite to the determination of whether all vestiges of the previous de jure segregated school system have been eliminated, and whether the school system has achieved a unitary status.
 
 
 67
 As I have noted, the crucial period that should have been examined was 1951, when the eight districts were formed from the consolidation of the previous twenty-one districts. Act 340, enacted in 1967, simply accepted the boundaries that had been set in 1951. Thus, if the 1951 boundaries were drawn to preserve racial segregation, there is a strong likelihood that their continuation, without change, sixteen years later carried the same stigma. In that event, the district court would not be precluded by Milliken v. Bradley from ordering integration across these lines. See Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 28, 91 S.Ct. 1267, 1282, 28 L.Ed.2d 554 (1971) ("When school authorities present a district court with a 'loaded game board,' affirmative action in the form of remedial altering of attendance zones is proper to achieve truly non-discriminatory assignments."). See also Wright v. Council of City of Emporia, 407 U.S. 451, 463, 92 S.Ct. 2196, 2203, 33 L.Ed.2d 51 (1972) ("[D]esegregation is not achieved by splitting a single school system operating 'white schools' and 'Negro schools' into two new systems, each operating unitary schools within its borders, where one of the two new systems is, in fact, 'white' and the other is, in fact, 'Negro.' ").
 
 
 68
 In summary, I dissent because I believe the court erred in finding that it was reviewing the actions of eight separate school districts rather than one school system. I think the district court should, on remand, consider the issues as framed by the existence of one school district rather than eight, and should reconstruct its factual finding on the issue of whether the eight constituent districts are vestiges of a segregated system.
 
 
 
 [1]
 In 1967, the school districts in Charleston County were operating with drastically different levels of funding due to their different tax bases. Three rural districts in Charleston County were barely able to maintain their operations due to the low levels of tax revenues collected in those districts. Relevant studies commissioned by the State Board of Education and the South Carolina General Assembly both recommended that in order for the level of education to improve in Charleston County, school districts should be consolidated for purposes of equalizing the funding accorded all the districts. See Charleston County, 738 F.Supp. at 1525
 
 
 [2]
 Sections 7 and 8 of Act 340 provide, in pertinent part, as follows:
 Power of trustees in constituent districts.--
 The trustees in each of the constituent districts shall have the power, subject to the appeal to the Board of Trustees of the Charleston County School District in the manner provided in Sections 21-247 et seq. of the Code of Laws of South Carolina, 1962 [now codified as § 59-19-510, et seq., of the 1976 Code]:
 (1) To transfer any pupil from one school to another within the same constituent district so as to promote the best interest of education, and determine the school within such constituent district in which any pupil shall enroll;
 (2) To suspend or dismiss pupils when the best interest of the school makes it necessary....
 Section 8 provides:
 Approval of teachers required prior to transfer.--
 No teacher or other professional employee shall be transferred from one constituent district to another without the approval of such employee, the Board of Trustees of the Charleston County School District, and the Trustees of each constituent district involved.
 1967 S.C.Acts 340, §§ 7, 8.
 
 
 [3]
 According to the record, a student is allowed to transfer to a school in a district other than that in which he or she resides if the student or his or her family owns property worth three hundred dollars or more in the transferee district. The record also indicates that it is apparently a long standing tradition within Charleston County to allow interdistrict transfers if a student wishes to transfer to a school in another district where his or her parent teaches. Transfers also appear possible if the student can show "hardship," if the student needs a specialized educational program, or in the situation where a specialized program exists in another district. See Jt.App., Vol. II, p. 383
 
 
 [4]
 The term "magnet school" generally denotes a public school "of voluntary enrollment designed to further integration by drawing students away from their neighborhoods and private schools through distinctive curricula and high quality." Missouri v. Jenkins, 495 U.S. 33, 110 S.Ct. 1651, 1657 n. 6, 109 L.Ed.2d 31 (1990); see also Price & Stern, Magnet Schools as a Strategy for Integration and School Reform, 5 Yale L. & Pol'y Rev. 291 (1987)
 While Memminger was officially termed a "model" school, Jt.App., Vol. I, p. 218, the record clearly indicates it was intended to fit the definition of a magnet school. See Jt.App., Vol. I, pp. 206-233.
 
 
 [5]
 We say the facts appear to have occurred because the district court judge, during relevant testimony, stated he did not fully understand "what happened at Memminger." Record, Vol. 32, p. 182. The facts set forth above are taken from the record, see Jt.App., Vol. I, pp. 177-79; 220-24, but the motivating factors behind district 10's refusal to grant the transfers to Memminger Elementary are not set forth in the district court's opinion
 
 
 [1]
 In 1963, an action was brought to desegregate the schools only in the City of Charleston. Millicent Brown v. School District # 20, Charleston, 226 F.Supp. 819 (D.S.C.1963). The Millicent court enjoined the operation of a dual school system in one district only (District 20). See also Whittenberg v. Greenville County School District, 298 F.Supp. 784 (D.S.C.1969), concerning orders relating to District 20 and other school districts in South Carolina
 
 
 [2]
 Section 1 of Act 340 provides:
 The eight school districts in Charleston County are hereby consolidated into a single school district to be known as the Charleston County School District, which shall be a body politic and corporate as provided in Section 21-111 of the Code of Laws of South Carolina, 1962, and shall be vested with all of the powers, duties, and assets of the school districts. The areas of the respective eight school districts are hereby created as special districts for the administrative purposes set forth in this act, ...
 
 
 [3]
 Section 4 of Act 340 states:
 The Superintendent of Education of Charleston County shall be ... selected on the basis of professional qualifications as an administrator and shall have had experience in the administration of the affairs of schools. The first Superintendent of Education for the Charleston County School District appointed under the provisions of this act shall serve as superintendent-elect beginning January 1, 1968 and shall proceed with the plans and organization for the operation of the Charleston County Schools under provisions of this act.... The Superintendent of Education of the Charleston County School District, in addition to the duties imposed upon county superintendents of education by the general laws of the state, shall perform such other duties as shall be prescribed by the Board of Trustees of the Charleston County School District.
 
 
 [4]
 Section 5 of Act 340 states:
 (2) Adopt and publish administrative policies and procedures and maintain a system of public relations which will keep the public fully informed of the operation of the public schools ...
 (6) Borrow in anticipation of the collection of taxes, state aid or federal aid....
 (7) Determine and evaluate the educational program in the schools in the constituent districts and provide a systematic program of curriculum development and revision designed to provide maximum educational opportunities for each child in the county;
 (8) Provide for physically and mentally handicapped children educational programs organized and conducted in cooperation with the social or civic organizations and agencies in the county or community; provided for intellectually gifted children a program which shall challenge their talents;
 (10) Authorize the purchase and sale of land, the planning and construction of new school facilities, and the maintenance and repair of existing buildings and grounds, and develop long-range planning for physical facilities and the educational program in the county;
 (11) Adopt a system of budgetary controls and annually adopt a budget, with power to revise when necessary, sufficient to meet the educational needs of the district;
 (12) Provide for the disbursement of all county, state, and federal educational funds received by the county or by any constituent district in the county;
 (13) Establish and maintain a central purchasing system for the purchase of all contractual services, equipment, and supplies and purchase all equipment and supplies pursuant to rules promulgated by the Board of Trustees in the Charleston County School District;
 (14) Prescribe the forms of vouchers or pay warrants to be used in said district;
 (15) Cooperate with the County Council of Charleston in the annual audit of the financial affairs of the district, and one copy of each audit shall be kept in the office of the board, and one copy shall be filed in the office of the Clerk of Court for Charleston County, to be open to the public.
 
 
 [5]
 The Act created boards of "trustees" in the constituent districts and in section 7, empowered them:
 (1) To transfer any pupil from one school to another within the same constituent district so as to promote the best interest of education, and determine the school within such constituent district in which any pupil shall enroll;
 ....
 (3) To cooperate with the State Highway Department in enforcing safety rules and regulations applicable to school buses and making provisions for school bus transportation within the area of a constituent district where such transportation has heretofore been in operation in such areas....
 
 
 [6]
 SECTION 6. Employment of teachers and personnel.--The teachers and other constituent district personnel necessary for the efficient operation of the schools in each constituent district shall be employed by the trustees thereof, subject to the approval of the Board of Trustees of the Charleston County School District
 
 
 [7]
 SECTION 8. Approval of teachers required prior to transfers.--No teacher or other professional employee shall be transferred from one constituent district to another without the approval of such employee, the Board of Trustees of the Charleston County School District, and the trustees of each of the constituent districts involved
 
 
 [8]
 Of course, the record demonstrates that blacks were bused throughout the county prior to 1951. Thus, we are somewhat skeptical that these boundaries were drawn because of the dangers of transportation